UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SALIH HALUK ERBEN,

    Plaintiff,

v.                                                  CASE NO: 8:11-cv-933-T-23AEP

RAYMOND JAMES EUROPEAN
HOLDINGS, INC., RAYMOND JAMES
INTERNATIONAL HOLDINGS, INC., and
RAYMOND JAMES FINANCIAL, INC.,

    Defendants.
_____/

**ORDER**

The plaintiff sues (Doc. 1) and alleges breach of contract, negligent supervision, conversion, civil fraud, and a violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68. The defendants move (Doc. 26) to dismiss, and the plaintiff responds (Doc. 32) in opposition.

Allegations of the Complaint

Salih Haluk Erben is an investor who resides in Turkey. Each defendant is a Florida corporation with a principal place of business in St. Petersburg, Florida. The defendant Raymond James European Holdings, Inc., ("RJ European") is a wholly owned subsidiary of Raymond James International Holdings, Inc., ("RJ International"), which is a subsidiary of Raymond James Financial, Inc. ("RJ Financial").

In 2005, Erben became acquainted with Fethi Berkan, an employee and "portfolio manager" for Raymond James Securities Turkey ("RJ Turkey"), a seventy-five percent-

owned subsidiary of RJ European.  Promotional material describes RJ Turkey as "the first U.S. member of the Istanbul Stock Exchange."  RJ Turkey (through Berkan) persuaded Erben to invest with RJ Turkey based "on the representation that [Erben] would be dealing with a U.S. brokerage with a sterling reputation and effective audit controls."  As a result of Berkan's inducement, Erben transferred more than six million dollars to RJ Turkey to establish a "margin account".

After the transfer, Erben frequently contacted Berkan to discuss trades.  Erben provided Berkan "buy or sell" instructions and Berkan promised to execute each instruction by "arranging for margin loans through RJ[] [Turkey] and Turkland Bank as required."  Erben signed "instruction documents" memorializing the transactions that Erben authorized.  Erben's agreement with RJ Turkey prohibits trades in Erben's account without Erben's consent.  Although RJ Turkey provided Erben neither a monthly statement nor a "trading confirmation," Erben maintained an account record that identified a "balance net of margin loans" equal to $8,735,790 at the end of 2006.

Without Erben's knowledge, Berkan failed to follow Erben's instructions, "routinely traded without authorization," and caused Erben to incur more than a million dollars in commissions.  The unauthorized trades resulted in the loss of "margin interest" and depleted the value of the assets in Erben's account.  RJ Turkey disclosed the fraud to Erben in May, 2007, after Erben sought to liquidate assets from his account in order to finance the formation of an aviation business.  Specifically, Erben sought money for a deposit to secure the purchase of a fourteen million dollar aircraft.  Upon Erben's requesting the liquidation of assets, Berkan informed Erben that RJ Turkey could

provide Erben only a fraction of the deposit necessary for the aircraft.  Erben was invited to a meeting scheduled for the following day, May 3, 2007, at RJ Turkey.

At the meeting, Kerem Bozkurt and Emir Sarpyener, managers of RJ Turkey, and Erkan Kilimci, a representative of Turkey's "Capital Markets Board," informed Erben of Berken's fraud.  Berkan had disregarded Erben's trading instructions and maintained a "secondary account statement" to deceive Erben.  Berken engaged in unauthorized trades, which generated large commissions and dissipated the assets in Erben's account to the extent that "the account value was exceeded by the outstanding and largely unauthorized margin loan."  The fraud resulted in Erben's postponing the aviation business and incurring a financial loss.  Erben faced litigation by Turkland Bank over the outstanding margin loan and ultimately lost his home.

Unable to help Erben, RJ Turkey told Erben to seek relief from the American owners of RJ Turkey.  Erben contacted Terrence Bedford, the chairman of RJ Turkey's board of directors and the president of RJ International.  Additionally, Erben met with John Critchlow, the auditor, controller, and a board member of RJ Turkey.  After determining that no parent corporation of RJ Turkey intended to atone for RJ Turkey's "liabilities" and Berken's misconduct, Erben complained to Istanbul's chief prosecutor.  The Capital Markets Board investigated but failed to determine when the fraud began because RJ Turkey's books and records were not susceptible to an audit.  Additionally, the Capital Markets Board investigation found (1) "conclusive evidence" of forgery of Erben's signature; (2) "significant," unauthorized commissions; (3) excessive interest on margin loans; (4) losses from unauthorized trades; (5) several deficiencies in RJ

Turkey's internal audit and control system; and (6) a failure to comply with approved procedure.

In October, 2008, the Capital Markets Board suspended RJ Turkey from operating in Turkey until RJ Turkey established a "capital adequacy ratio". Erben was unaware that RJ Turkey was "badly undercapitalized". After RJ Turkey's suspension, RJ Turkey became "completely insolvent" with no recoverable assets. In October, 2010, an inspector for the Capital Markets Board testified (during a criminal proceeding against several former RJ Turkey employees) (1) that RJ Turkey's parent companies completely controlled RJ Turkey, (2) that RJ Turkey and maintained "no independent existence," and (3) that "funds had been removed from RJ[] [Turkey] prior to its insolvency". At this time, RJ Turkey no longer maintains a presence in Turkey.

## Discussion

In moving to dismiss, the defendants argue (1) that the complaint is "an improper attempt to pierce the corporate veil" through three levels of parent corporations "based on the alleged wrongdoing of a non-party Turkish subsidiary corporation and its Turkish employee"; (2) that the plaintiff fails to allege facts showing that the defendants purposefully created or used RJ Turkey to perpetrate fraud; and (3) that the complaint otherwise fails to state a claim and fails to comply with Rules 8 and 9, Federal Rules of Civil Procedure. In response, the plaintiff argues (1) that the defendants exaggerate the plaintiff's pleading burden, (2) that proof of fraud is not essential to piercing the corporate veil, (3) that the plaintiff alleges facts sufficient to justify piercing the corporate veil, and (4) that the complaint otherwise states a claim on each of the five counts.

"[T]he corporate veil may not be pierced absent a showing of improper conduct." Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114, 1121 (Fla. 1984) (quoting Advertects, Inc. v. Sawyer Indus., Inc., 84 So. 2d 21, 23-24 (Fla. 1955)). "Improper conduct is present only in "'cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.'" Johnson Enter., Inc. v. FPL Group, Inc., 162 F.3d 1290, 1320 (11th Cir. 1998) (quoting Dania Jai-Alai). As Dania Jai-Alai explains:

> The rule is that the corporate veil will not be pierced, either at law or in equity, unless it be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them . . . . In the absence of pleading and proof that the corporation was organized for an illegal purpose or that its members fraudulently used the corporation as a means of evading liability with respect to a transaction that was, in truth, personal and not corporate, [a plaintiff] cannot be heard to question the corporate existence but must confide his efforts to the remedies provided by law for satisfying his judgment from the assets of the corporation, if any can be found.

450 So. 2d at 1119-20 (quoting Riley v. Fatt, 47 So. 2d 769, 773 (Fla. 1950)) (citations omitted). Accordingly, "[n]o liability attaches to the parent for the wrongful conduct of the subsidiary unless the parent exercises control to the extent that the subsidiary exists as the parent's mere agent or instrumentality." Cook v. Smith, 2006 WL 580991, *2 (M.D. Fla. 2006); Johnson, 162 F.3d at 1320 (explaining that the plaintiff must show both that the subsidiary was a "mere instrumentality" and that the parent engaged in "improper conduct" in the organization or use of the subsidiary). A plaintiff must demonstrate that the parent exhibited "more than a high degree of control" over the subsidiary. Cook, 2006 WL 580991 at *2 (citing cases); In re Homelands of DeLeon

Springs, Inc., 190 B.R. 666, 670-71 (M.D. Fla. 1995) (Funk, J.) (finding that piercing the corporate veil requires that the shareholder dominated and controlled the corporation to the extent that the corporation lacked an independent existence, that the corporate form was used fraudulently or for an improper purpose, and that the fraudulent or improper use of the corporate form caused injury to the plaintiff).  However, "[l]iability rarely attaches to a parent and indiscriminate use of the 'mere instrumentality' rule destroys the purpose of corporate law."  Cook, 2006 WL 580991 at *2 (citing Brown v. Margrande Compania Naviera, S.A., 281 F. Supp. 1004, 1005-06 (D. Va. 1968)).

      Because the practice of commercial enterprise, both wholesome and unwholesome, features means and forms unbounded in variety, no list of attributes encompasses each fact or factor that might reveal or rebut the disregard or abuse of corporateness.  The factors typically and initially examined in assessing corporate independence include (but are not limited to) (1) failure to observe usual corporate formalities, (2) inadequate capitalization, (3) intermingling of assets and property, (4) shared offices and contact information, (5) either a guarantee or a payment of the corporation's debt by the dominant shareholder or parent, (6) a lack of arms-length transactions, (7) consolidated financial statements and tax returns, (8) dependence on the parent to generate business, (9) a joint accounting and payroll system, (10) financing derived from the parent, (11) failure to operate as an independent profit center (but rather as a department of the parent corporation), (12) failure to pay dividends, (13) non-functioning or interlocking officers and directors, (14) employment of the same attorneys, and (15) a limited degree of discretion.

In moving to dismiss, the defendants argue (1) that the complaint is devoid of facts "as opposed to conclusory statements" showing that RJ Turkey was a "mere instrumentality" of "three levels of parent corporations"; (2) that the plaintiff alleges "only normal circumstances of ownership attendant with parent/subsidiary relationships"; (3) that the allegations fail to satisfy the standard described in Dania Jai-Alai; (4) that the complaint contains no facts showing that the defendants "organized or used RJ Turkey to commit fraudulent acts or mislead creditors"; (5) that the complaint fails to allege a fraudulent statement or omission by the defendants; and (6) that, although RJ Turkey purportedly became undercapitalized and insolvent in 2008,[1] the complaint contains no allegation that RJ Turkey was undercapitalized and insolvent upon formation.  In response, the plaintiff argues that complaint alleges facts sufficient to pierce the corporate veil, which allegations include (1) the ownership structure and corporate relation between RJ Turkey, RJ European, RJ International, and RJ Financial; (2) the defendants' "dominance" of RJ Turkey "including placement of the [d]efendants' officers and agents in key positions"; (3) the investigation and report by the Capital Markets Board "regarding the failures of RJ[] [Turkey's] audit procedures"; (4) the testimony of the Capital Markets Board's inspector, who "concluded that RJ[] [Turkey] was completely dominated by its U.S. parents"; and (5) the allegation that RJ Turkey was undercapitalized and that "funds were removed from RJ[] [Turkey] prior to its collapse".

---

[1] "[I]nadequate capitalization refers to the amount of capital provided to a subsidiary upon its formation.  A subsidiary [that] incurs losses subsequent to its incorporation is not considered undercapitalized." In re Hillsborough Holdings Corp., 176 B.R. 223, 234 (M.D. Fla. 1994) (Nimmons, J.) (citations omitted).

- 7 -

In this instance, the complaint fails to allege facts sufficient to show either that the defendants engaged in improper conduct or that RJ Turkey was a "mere instrumentality" of the defendants. The complaint contains no facts supporting the defendants' alleged "dominance" over RJ Turkey. Rather, the alleged testimony of the inspector from the Capital Markets Board provides unsupported conclusions (in the form of hearsay and entitled to no weight) about the "dominance" and "control" of RJ Turkey by its U.S. parent corporations. The complaint alleges (1) that two of the defendants' officers occupied a position on RJ Turkey's board of directors, (2) that one of the defendants' officers worked as an auditor and controller for RJ Turkey, and (3) that RJ European owned a seventy-five percent interest in RJ Turkey. These facts, however, appear to illustrate a typical parent-subsidiary relation and to provide little, if any, support for piercing the corporate veil.

Furthermore, as the defendants argue, the complaint fails to allege that RJ Turkey was insolvent and undercapitalized upon formation (which supports the allegation that the corporation was "a mere device or sham") but alleges that in 2008 RJ Turkey was undercapitalized and became insolvent (which provides no support for the allegation that the corporation was "a mere device or sham"). See Johnson, 162 F.3d at 1320; In re Hillsborough Holdings, 176 B.R. at 234. The complaint contains no facts showing either that the defendants dominated and controlled RJ Turkey to the extent that RJ Turkey lacked an independent existence or that the defendants disregarded the corporate form. The Capital Markets Board found that RJ Turkey both maintained an inadequate audit and control system and failed to comply with approved audit and

control procedures.  However, these allegations (without more) fail to state a claim that RJ Turkey maintained no independent existence, observed no corporate formality, and served only as an artifice in a scheme to defraud or deceive.

### Conclusion

Accordingly, because the complaint contains no factual support for piercing the corporate veil, the plaintiff fails to state a claim.  The defendants' motion (Doc. 26) to dismiss is **GRANTED**.  The plaintiff may file an amended complaint no later than **July 14, 2011**.

ORDERED in Tampa, Florida, on June 30, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE